FILED
2025 Jan-28  AM 11:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Case No.** |
| **v.** | ) | |
| | ) | |
| **BENJAMIN DANIEL SHOEMAKER** | ) | |

## PLEA AGREEMENT

The Government and the defendant, **BENJAMIN DANIEL SHOEMAKER**, hereby acknowledge the following plea agreement in this case:

## PLEA

The defendant agrees to (i) plead guilty to **COUNTS ONE, TWO,** and **THREE** of the Information filed in the above-numbered and -captioned matter; (ii) stipulate to United States Sentencing Guideline §2A1.4(a)(2)(A)(Involuntary Manslaughter Involving Reckless Conduct)-18 Base Offense Level as to **COUNT ONE,** §3A1.3 (Restraint of Victim)-2 Level Enhancement as to **COUNTS ONE, TWO, and THREE**, §3A1.1 (Vulnerable Victim)-2 Level Enhancement as to **COUNT ONE**, and §3B1.1 (Aggravating Role)-4 Level Enhancement as to **COUNT ONE**, and (iii) waive certain rights to direct appeal and collateral attack as outlined in section **IV** of this agreement. In exchange, the United States Attorney, acting on behalf of the Government and through the undersigned Assistant United

Defendant's Initials _BDS_

States Attorney, agree to recommend the disposition specified below, subject to the conditions in section **VII**.

## TERMS OF THE AGREEMENT

## I.  MAXIMUM PUNISHMENT

The defendant understands that the maximum statutory punishment that may be imposed for the crime of Conspiracy to Deprivation of Rights under Color of Law, in violation of Title 18, United States Code, Section 241, as charged in **COUNT ONE** is:

A.    Imprisonment for not more than life imprisonment;

B.    A fine of not more than $250,000.00, or;

C.    Both (a and b);

D.    Supervised release of not more than five years; and

E.    Special Assessment Fee of $100 per count.

The defendant understands that the maximum statutory punishment that may be imposed for the crime of Deprivation of Rights under Color of Law, in violation of Title 18, United States Code, Section 242, as charged in **COUNTS TWO** and **THREE** is:

A.    Imprisonment for not more than ten years;

B.    A fine of not more than $250,000.00, or;

C.    Both (a and b);

Defendant's Initials BDS

D.    Supervised release of not more than three years; and

E.    Special Assessment Fee of $100 per count.

## II.    FACTUAL BASIS FOR PLEA

The Government is prepared to prove, at a minimum, the following facts at

the trial of this case:

### A. Deliberate Indifference to Individual #1's Medical Needs

On January 12, 2023, the Walker County Jail (Jail) was headed by the elected
Sheriff, the Jail Administrator, the Captain, and officers who served as shift
supervisors over two day shifts and two night shifts. Each shift was staffed by several
officers who performed various duties related to the care, custody, and control of the
pre-trial and post-conviction detainees housed there. In general, officers typically,
worked 12-hour shifts on a rotation of 4 days on, 4 days off, 3 days on, 3 days off
over the course of a two-week period.

While the Jail contained several dorms to house detainees, a limited number
of detainees were held for limited periods in observation cells in the "Booking" area.
Booking consisted of the Booking desk which formed the central hub of detainee
intake, jail movement, communication, and operations. Eight booking cells could be
directly observed by officers at the Booking desk several feet away. Among the eight
Booking cells, BK5 was unique in that it was essentially a cement box with a small
grate on the floor that opens into a hole for fluids to drain from the cell. Among the
eight Booking cells, BK5, along with BK1, 2, 3, and 4, were unique in that they were
all essentially cement boxes. Capable of being "flushed" only from outside of the
cell, BK5 was often referred to as the drunk tank in that it could easily be hosed
down when inebriated people held there would vomit. BK5, as well as BK1, 2, 3,
and 4, were unlike the other regular cells in the Jail, except for AH3, which was an
observation cell which had no hole in the floor, and was used only for holding
detainees for a few hours at a time.

BK5 did not have a sink, a toilet, access to any running water, or a raised
platform to be used as a bed. Detainees housed in BK5 depended on officers to escort
them to a toilet or shower and relied on officers to bring them water. BK5 was
notoriously cold during winter months and the temperature on the bare cement floor

Defendant's Initials _BDS_

was even colder. A small window was located on the top half of the cell door and a larger window covered the bottom half of the door.

Medical and mental health services were provided by an outside contractor hired by Walker County. As part of the booking process, all detainees booked into the Jail were supposed to receive a medical and mental health screening to ensure that emergent and urgent health needs are met and to determine, among other things, their fitness for confinement. Correctional officers were trained that sometime after the booking process was completed medical personnel would identify daily each detainee that needed to be seen by a nurse for an initial intake evaluation ("Initial Intake") or for ongoing consultation/evaluation, including providing approved medicine. For those detainees housed in Booking, nurses would rely on officers for assistance to provide necessary medical and mental health services, including escorts into the Jail's medical unit which was located just down a short hallway from Booking.

On January 12, 2023, Walker County Sheriff's deputies responded to the home of Individual #1 in response to a request that they conduct a mental health welfare check. Individual #1 was arrested after he allegedly fired a gun while deputies were on his property and officers in the Jail became aware of his arrest through the Sheriff's social media posts and conversations amongst themselves.

Individual #1 was transported directly to the Jail in a patrol car that was met in the Jail's sallyport by correctional officers and supervisors including defendant **SHOEMAKER,** CO-CONSPIRATOR #1, CO-CONSPIRATOR #2, CO-CONSPIRATOR #3, CO-CONSPIRATOR #4, and CO-CONSPIRATOR #5. Upon being removed from the patrol car, Individual # 1 could not walk or stand on his own. He was disoriented, non-combative, and could not follow instructions. These observations were obvious to everyone who removed Individual #1 from the car.

Upon entry into the Jail, Individual #1 was taken to a dress-out room so that he could change from his street clothes into a jail uniform. He was sufficiently helpless that he was not capable of undressing or dressing himself. Officers simply wrapped a suicide smock around him (known as a "turtle" suit) without an indication that Individual #1 was suicidal or instructions that he needed to be naked for security reasons.

Defendant's Initials  BDS

Thereafter, Individual #1 was taken by wheelchair to the medical unit which was attended by the Health Services Administrator ("HSA"), NURSE 1, and NURSE 2. At that time, the HSA told defendant **SHOEMAKER,** CO-CONSPIRATOR #2, CO-CONSPIRATOR #3, and CO-CONSPIRATOR #4 that "she wanted to wait," referring to instructions from CO-CONSPIRATOR # 1 to deny the initial fit for confinement screening to Individual #1. Defendant **SHOEMAKER,** CO-CONSPIRATOR #2, CO-CONSPIRATOR #3, and CO-CONSPIRATOR #4 turned the wheelchair around, headed out of the medical unit, and placed Individual #1 into cell BK5.

Defendant **SHOEMAKER** understood that initial medical evaluations for detainees were routine and required. CO-CONSPIRATOR #1's intervention was unusual because CO-CONSPIRATOR #1 was not typically involved in whether detainees received these evaluations. The Jail routinely detained people charged with violent offenses who demonstrated a range of challenging behaviors upon entering booking, but medical evaluations were never denied and CO-CONSPIRATOR #1 had not previously stopped one from taking place. Consequently, defendant **SHOEMAKER** approached CO-CONSPIRATOR #1 to inquire about Individual #1 being treated differently. Instead of answering him, CO-CONSPIRATOR #1 merely told defendant **SHOEMAKER** that CO-CONSPIRATOR #1 would "handle it," or words to that effect. The unusual, non-responsive answer confirmed to defendant **SHOEMAKER** immediately that Individual #1 would be treated differently than other detainees and that CO-CONSPIRATOR #1 did not want Individual #1 to receive medical treatment, either to punish him for what Individual #1 was accused of doing that prompted his arrest or to hide anything that might have been done to Individual #1 by those who arrested him.

His understanding was confirmed later when CO-CONSPIRATOR #1 instructed defendant **SHOEMAKER** to treat Individual #1 "as though" or "as if" he was on "suicide watch," even though there were no indications that Individual #1 was suicidal. In fact, throughout Individual #1's detention, CO-CONSPIRATOR #1 used the phrase "suicide watch" as a short-hand instruction for maintaining Individual #1 in cruel conditions – a short-hand that was adopted by defendant **SHOEMAKER**. Defendant **SHOEMAKER** didn't believe Individual #1 was suicidal, didn't have indications that he was suicidal, nor did defendant **SHOEMAKER** or anyone else provide the care and treatment Individual #1 should have received if he was suicidal.

Defendant's Initials BDS

However, Individual #1's mental health needs were immediately apparent to defendant **SHOEMAKER**. As such, defendant **SHOEMAKER** spoke with the Nurse Practitioner directly about the kind of mental healthcare Individual #1 could receive at the Jail or at a hospital early in his detention. The Nurse Practitioner was dismissive of Individual #1's needs. She did not appear to be concerned about Individual #1's situation. She did not offer to examine Individual #1, ensure that he was examined, nor take any steps to ensure that his conditions of confinement didn't exacerbate his mental health symptoms.

Defendant **SHOEMAKER** had previously joked with the Nurse Practitioner about correctional officers punishing detainees for their supposed misbehaviors by mistreating them. Consequently, Defendant **SHOEMAKER** understood that the Nurse Practitioner didn't view Individual #1 or any punishment he would suffer as her problem. Similarly, defendant **SHOEMAKER** had no concerns that any of the other medical staff would object to conditions in which Individual #1 was kept or how he was treated because defendant **SHOEMAKER** knew the medical staff were aware that correctional officers mistreated other detainees without taking steps to alert proper authorities.

To the best of defendant **SHOEMAKER'S** knowledge, Individual #1 never received any medical evaluation until the morning of his death, two weeks after he was arrested. Defendant **SHOEMAKER** worked several shifts during Individual #1's two-week incarceration and during that time none of the officers, including defendant **SHOEMAKER,** made efforts to provide medical care for Individual #1 nor alter the conditions of his confinement. To the contrary, defendant **SHOEMAKER,** CO-CONSPIRATOR #2, CO-CONSPIRATOR #3 and CO-CONSPIRATOR #4, as well as others actively denied medical access to Individual #1 by falsely telling medical staff that Individual #1 was "too combative to be evaluated," when in truth that was not the case. This was intentionally done to punish Individual #1 for his perceived offense of having shot at deputies on the day of his arrest. Moreover, CO-CONSPIRATOR #1 never addressed ensuring medical care was provided to Individual #1 after her initial dismissal of defendant **SHOEMAKER** in which she said she'd "handle it"

Calling Individual #1 "combative" was an excuse to mistreat him and to purposefully deny him medical care. There was no conduct that could have been committed by Individual #1 that would have justified the denial of medical access since the Jail could manage or control any behavior that Individual #1 might have exhibited. The capabilities of the Jail to manage detainees were known and obvious

to everyone who worked there, including medical staff who routinely examined or evaluated the needs of detainees who were in handcuffs or restraints of one kind or another. Moreover, Individual #1 was frailer than most other detainees whom defendant **SHOEMAKER** and his CO-CONSPIRATORS encountered.

In the first week of Individual #1's detention, Defendant **SHOEMAKER** and these CO-CONSPIRATORS repeatedly made comments to the effect of Individual #1 should have been killed because he shot at deputies rather than being brought to the Jail, that they would have killed him if they were the ones responding to the welfare check, and that road deputies should have killed him rather than making the correctional officers have to deal with incarcerating him. At least once during each shift, either defendant **SHOEMAKER,** or CO-CONSPIRATOR #2, CO-CONSPIRATOR #3, or CO-CONSPIRATOR #4, would comment on Individual #1's mental health needs or the cruel conditions in which he was held and some member of the conspiracy would dismiss Individual #1's needs by saying: "Fuck him, he gets what he gets since he shot at cops," or words to that effect.

Information related to detainees and Jail functions were generally communicated between day and night shifts during "pass-down" which occurred when one shift finished, and the next shift started. Defendant **SHOEMAKER**, CONSPIRATOR #2, CO-CONSPIRATOR #3, and CONSPIRATOR #4 would routinely repeat the falsehood that Individual #1 was "too combative" to receive services or be moved from BK5 with the effect that Individual #1's cruel conditions of confinement would persist. Defendant **SHOEMAKER** intended and understood that these comments made by his shift would deter other shifts from changing Individual #1's circumstances. Defendant **SHOEMAKER** had previously been praised in front of much of the Jail staff by CO-CONSPIRATOR #1 and others for punishing a detainee by assaulting him, resulting in his immediate promotion to Lieutenant and granting him status in the eyes of Jail staff. Consequently, defendant **SHOEMAKER** believed that the pass-down references made by members of his shift would be adopted by other shifts and that the intentions of CO-CONSPIRATOR #1 would be followed by all other correctional officers.

The efforts to deny Individual #1 care persisted despite his obvious need for mental health and medical services. Individual #1 was frequently expressing severe mental health symptoms such as talking incoherently about "demons" and "portals." He was often covered in feces, which was an indication that he could not care for himself. Defendant **SHOEMAKER** observed Individual #1 deteriorate over the course of his incarceration. As the time passed, Individual #1 was almost always

Defendant's Initials BOS

naked, wet, cold, and covered in feces while lying on the cement floor without a mat or blanket. By the second week of incarceration, Individual #1 was largely listless and mostly unresponsive to questions from officers. Nonetheless, to the best of his knowledge, neither defendant **SHOEMAKER**, nor any of the CO-CONSPIRATORS took steps to alter the conditions in which Individual #1 was housed despite Individual #1's obvious suffering.

During Individual #1's detention, some correctional officers would occasionally approach defendant **SHOEMAKER** and ask about changing the conditions of Individual #1's confinement, although they would not move him or give him anything to keep warm on their own. Defendant **SHOEMAKER** and his CO-CONSPIRATORS rejected any suggestions about getting Individual #1 a mat or a blanket by merely saying Individual #1 was on "suicide watch," parroting CO-CONSPIRATOR #1 and again repeating the false claims that Individual #1 was "too combative."

At one point, defendant **SHOEMAKER** wondered if the treatment of Individual #1 had gone too far. About a week into Individual #1's confinement, defendant **SHOEMAKER** asked CO-CONSPIRATOR #1 if Individual #1 should be taken to a mental health hospital. CO-CONSPIRATOR #1 declined to transfer Individual #1, give him anything to warm him up, change the conditions of confinement, or request that Individual #1 receive an evaluation and services from the Jail's nursing staff. Once CO-CONSPIRATOR #1 refused to take any action on behalf of Individual #1, Defendant **SHOEMAKER** decided that he was "not going to go out of his way" to help Individual #1.

To the contrary, defendant **SHOEMAKER** and CO-CONSPIRATOR #1 planned to use their harsh treatment of Individual #1 for their personal gain. On the morning of January 24, 2023, a Walker County Commissioner was scheduled to visit the Jail to observe various cell and working conditions. Defendant **SHOEMAKER**, CO-CONSPIRATOR #1, their CO-CONSPIRATORS, and others at the Jail wanted the Walker County Commission to increase jailer pay. Defendant **SHOEMAKER** and CO-CONSPIRATOR #1 wanted to show the County Commissioner how difficult working at the Jail was, how "crazy" and "disgusting" some of the detainees were, and the amount of management the detainees required. To further this goal, defendant **SHOEMAKER** and others intentionally left Individual #1's cell as filthy as possible so CO-CONSPIRATOR #1 and defendant **SHOEMAKER** could use Individual #1 and his cell as a prop to show the County Commissioner.

Defendant's Initials BOS

However, this plan was undermined when a jailer that was unaware of the plan had the garbage and left-over food in Individual #1's cell cleaned out prior to the County Commissioner's visit. Defendant **SHOEMAKER** berated this jailer for cleaning out Individual #1's cell because he was worried that CO-CONSPIRATOR #1 was going to be angry at him if the plan failed. Consequently, he adjusted their plan by convincing a different detainee in the Jail's booking area to act "crazy" when the County Commissioner visited. After this detainee did so, defendant **SHOEMAKER** rewarded him with a pack of honey buns.

At the beginning of his shift on January 26, 2023, around 6:00 am, several officers told defendant **SHOEMAKER** that the Nurse Practitioner had seen Individual #1 in the early morning hours and ordered that Individual #1 be transported to a hospital and that the transport should take place as soon as possible. Defendant **SHOEMAKER** initially dismissed these concerns. Those officers were insistent in telling defendant **SHOEMAKER** that the nurse said Individual #1 must be taken to the hospital to the point of repeating the message a second time. In response to the second effort by those officers, defendant **SHOEMAKER** replied: "I'll tell you what, next time you're on the toilet taking a shit, I'll call to bother you with something unimportant," or words to that effect.

Despite his dismissive statements, Defendant **SHOEMAKER** thought that Individual #1 looked like he was "barely alive." Thereafter, defendant **SHOEMAKER** contacted the Nurse who confirmed that Individual #1 needed to go to the hospital. Defendant **SHOEMAKER** was concerned that if Individual #1 was sent out of the Jail, the abuse of Individual #1 would come to light.

Defendant **SHOEMAKER** called CO-CONSPIRATOR #1 looking for guidance and told her about the nurse's order. Despite the obvious emergency, CO-CONSPIRATOR #1 told defendant **SHOEMAKER** not to send Individual #1 to the hospital until she arrived at the Jail and "put eyes on" Individual #1 herself. Defendant **SHOEMAKER** understood that any delays in transport could contribute to serious harm to Individual #1, would be contrary to policy that dictated deferring to the medical personnel, and was designed for CO-CONSPIRATOR #1 to look after her own interests in avoiding transport for Individual #1 out of the Jail. Nonetheless, defendant **SHOEMAKER** failed to arrange for transport.

CO-CONSPIRATOR #1 informed defendant **SHOEMAKER** that she was sending another officer to the Jail with protein drinks and that defendant **SHOEMAKER** should try and make Individual #1 drink them. When the other

Defendant's Initials BDS

officer arrived, defendant **SHOEMAKER** tried to get Individual #1 to drink the protein drink as he was instructed, but Individual #1 was unable to do so. Defendant **SHOEMAKER** had never seen a detainee that a nurse ordered to the hospital be given a protein drink instead.

CO-CONSPIRATOR #1 finally arrived at the Jail approximately 60 – 90 minutes after defendant **SHOEMAKER'S** call. After checking on Individual #1 herself and seeing his dire condition, CO-CONSPIRATOR #1 told defendant **SHOEMAKER** that she would call a transport officer to come to the Jail to take Individual #1 to the hospital rather than call an ambulance or have another officer already at the Jail take Individual #1 to the hospital. The transport officer lived a good distance from the Jail and was at home at the time CO-CONSPIRATOR #1 would have called him.

Defendant **SHOEMAKER** understood that CO-CONSPIRATOR #1 wanted to delay as long as possible in transporting Individual #1 to the hospital because he was not ordered to call 911, the transport officer lived far from the Jail, and CO-CONSPIRATOR #1 herself left the Jail to retrieve a different arrestee for booking, rather than driving three miles to the hospital with Individual #1. As such, defendant **SHOEMAKER** simply waited for the transport officer to arrive according to the wishes of CO-CONSPIRATOR #1, despite recognizing the increasingly serious risks of harm to Individual #1 posed by the delays. After the transport officer arrived, defendant **SHOEMAKER** further delayed taking Individual #1 out of BK5 to the hospital as they waited for CO-CONSPIRATOR #1 to process the arrestee she had picked up.

After more than 3 hours had passed since officers reported the nurse's instructions and the urgent need to do so, Individual #1 was transported to the hospital. Upon arrival, he suffered cardiac arrest from which he did not recover. Emergency personnel documented his core body temperature as 72 degrees Fahrenheit, a temperature incompatible with life. An autopsy performed by the Alabama Department of Forensic Sciences determined that the cause of Individual #1's death was hypothermia with the contributing factor of sepsis from infected injuries obtained during incarceration and medical neglect. Blood cultures revealed the presence of bacteria associated with human fecal matter.

**B. The Assault of Individual #2**

On or about November 17, 2022, Defendant **SHOEMAKER** while at the Jail, was requested to assist with the capture of Individual #2, a detainee that had walked out of the Jail. After WCSO personnel found Individual #2 and returned him to the Jail, defendant **SHOEMAKER** and other correctional officers dressed Individual #2 in a Jail uniform, handcuffed him behind his back, and proceeded to drag him down the hallway to one of the dorms. Defendant **SHOEMAKER** was accompanied by several CO-CONSPIRATORS, other correctional officers, and WCSO personnel. It was apparent to defendant **SHOEMAKER,** and everyone present, that Individual #2 was going to be beaten to "teach him a lesson" because he escaped from the Jail. Individual #2 was thrown in a cell and CO-CONSPIRATOR #6 punched Individual #2 in the face. Thereafter, defendant **SHOEMAKER** put Individual #2 in a headlock while he and several other correctional officers punched Individual #2 several times while he was handcuffed and restrained. Defendant **SHOEMAKER's** pants were covered with Individual #2's blood. At no time during any aspect of the beating administered to Individual #2 did he pose a risk of harm to himself or any officer nor was any amount of force, other than placing him in a cell, necessary to manage his escort.

Later that same night, defendant **SHOEMAKER** attended a meeting conducted by Jail administrators about Individual #2. Everyone in the meeting understood that Individual #2 had been beaten. During that meeting, defendant **SHOEMAKER** was singled out as a role model with blood on his clothes. Jail administrators praised defendant **SHOEMAKER**, who punched Individual #2 while he was restrained, and encouraged correctional officers to physically abuse detainees in the future to exert dominance over the detainees. Defendant **SHOEMAKER** had intended to stop working at the Jail prior to this incident. However, as a reward for defendant **SHOEMAKER's** actions, Jail administrators offered defendant **SHOEMAKER** a promotion to Lieutenant, which he took.

Defendant **SHOEMAKER** also attended a meeting at the Jail several weeks later where CO-CONSPIRATOR #6 bragged about having punched Individual #2. This was not the first time CO-CONSPIRATOR #6 had bragged about physically abusing a detainee. Defendant **SHOEMAKER** understood from this episode that the Jail administration approved of the Jail's prevailing culture of punishing detainees. As part of this prevailing culture, defendant **SHOEMAKER** and other correctional officers would brag and laugh about uses of force against detainees. They would also record security video footage of detainees that had been beaten and

later show the videos to other correctional officers where they would mock the detainees who got beaten.

### C. The Assault of Individual #3

On or about January 12, 2023, defendant **SHOEMAKER** and CO-CONSPIRATOR #2 were called to assist a correctional officer with Individual #3, a pre-trial detainee, who was not complying with an order to be moved to his cell. Defendant **SHOEMAKER** and CO-CONSPIRATOR #2 tackled Individual #3 and dragged him down a set of stairs before the initial correctional officer who requested assistance handcuffed Individual #3 behind his back. Defendant **SHOEMAKER** and CO-CONSPIRATOR #2 placed Individual #3 in the restraint chair. Defendant **SHOEMAKER** and CO-CONSPIRATOR #2 punished Individual #3, repeatedly punching him in the stomach and head. Defendant **SHOEMAKER** acknowledged that the force used against Individual #3 was unnecessary, excessive, and had no legitimate law enforcement purpose.

**The defendant hereby stipulates that the facts stated above are substantially correct and that the Court can use these facts in calculating the defendant's sentence. The defendant further acknowledges that these facts do not constitute all the evidence of each and every act that the defendant and/or any co-conspirators may have committed.**

1/23/25

**BENJAMIN DANIEL SHOEMAKER**

Defendant's Initials BDS

## III.    RECOMMENDED SENTENCE

Subject to the limitations in section **VII** regarding subsequent conduct and pursuant to Fed. R. Crim. P. 11(c)(1)(B), the Government will recommend the following disposition:

**A.**    That the defendant be awarded a two (2) level reduction in the defendant's adjusted offense level, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the defendant's criminal conduct. The Government agrees to make a motion pursuant to USSG §3E1.1(b) for an additional one-level decrease in recognition of the defendant's prompt notification to the Government of the intention to enter a plea of guilty. The Government may oppose any adjustment for acceptance of responsibility if the defendant: (1) fails to admit each and every item in the factual stipulation; (2) denies involvement in the offense; (3) gives conflicting statements about the defendant's involvement in the offense; (4) is untruthful with the Court, the Government, or the United States Probation Officer; (5) obstructs or attempts to obstruct justice prior to sentencing; (6) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (7) attempts to withdraw the defendant's plea of guilty for any reason other than those expressly enumerated in the "Waiver of Right to Appeal and Post-Conviction Relief" section of this Plea Agreement;

**B.**    That the defendant be remanded to the custody of the Bureau of Prisons and incarcerated for a term consistent within the advisory United States Sentencing Guideline range as calculated by the Court at the time of sentencing;

**C.**    That following said term of imprisonment, the defendant be placed on supervised release for a period to be determined by the Court, subject to the Court's standard conditions of supervised release;

**D.**    That the defendant be required to pay a fine in accordance with the sentencing guidelines should the Court determine that the defendant has the ability to pay a fine, said amount due and owing as of the date

Defendant's Initials BDS

sentence is pronounced, with any outstanding balance to be paid in full by the expiration of the term of supervised release; and,

E.     That the defendant pay a special assessment of $300.00, said amount due and owing as of the date sentence is pronounced.

## IV.    WAIVERS

### A.    STATUTE OF LIMITATIONS WAIVER

In consideration of the recommended disposition of this case, I, BENJAMIN DANIEL SHOEMAKER, hereby understand, acknowledge, and agree that if this plea agreement is set aside for any reason, I will not assert any defense based on any applicable statute of limitations or the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*, that includes the passage of time from and including the date of this plea agreement until and including the date of entry of any order setting this plea agreement aside.

### B.    RIGHT TO APPEAL AND POST-CONVICTION RELIEF

In consideration of the recommended disposition of this case, I, BENJAMIN DANIEL SHOEMAKER, hereby waive and give up my right to appeal my conviction and/or sentence in this case, as well as any fines, restitution, and forfeiture orders, the Court might impose. Further, I waive and give up the right to challenge my conviction and/or sentence, any fines, restitution, forfeiture orders imposed or the manner in which my conviction and/or sentence, any fines, restitution, and forfeiture orders were determined

Defendant's Initials BDS

in any post-conviction proceeding, including, but not limited to, a motion brought under 28 U.S.C. § 2255, and any argument that (1) the statute to which I am pleading guilty is or are unconstitutional or (2) the admitted conduct does not fall within the scope of the statute.

The defendant reserves the right to contest in an appeal or post-conviction proceeding(s) the following:

1. Any sentence imposed in excess of the applicable statutory maximum sentence(s);

2. Any sentence imposed in excess of the Guidelines range determined by the Court at the time sentence is imposed; and

3. Ineffective assistance of counsel.

The defendant acknowledges that before giving up these rights, the defendant discussed the United States Sentencing Guidelines and their application to the defendant's case with the defendant's attorney, who explained them to the defendant's satisfaction. The defendant further acknowledges and understands that the Government retains its right to appeal where authorized by statute.

## C.     WAIVER OF RULE 410, RULE 11, AND SECTION 1B1.8(a)

The defendant agrees that if he fails to comply with any of the provisions of this agreement, including the failure to tender such agreement to the district court, or attempts to withdraw the plea (prior to or after pleading guilty to the

Defendant's Initials BDS

charges identified in the agreement), the government will have the right to characterize such conduct as a breach of the agreement. In the event of such a breach, the defendant waives any protections afforded by Section 1B1.8(a) of the Sentencing Guidelines, Rule 11 of the Federal Rules of Criminal Procedure, and Rule 410 of the Federal Rules of Evidence, and the government will be free to use against the defendant, directly and indirectly, in any criminal or civil proceeding any of the information, statements, and materials provided by him pursuant to this agreement, including offering into evidence or otherwise using the attached Agreed Factual Basis for Guilty Plea.

I, BENJAMIN DANIEL SHOEMAKER, hereby place my signature on the line directly below to signify that I fully understand the foregoing paragraphs, and that I am knowingly and voluntarily entering into this waiver.

1/25/25

BENJAMIN DANIEL SHOEMAKER

## V.    UNITED STATES SENTENCING GUIDELINES

The defendant's counsel has explained to the defendant, that in light of the United States Supreme Court's decision in *United States v. Booker*, the federal sentencing guidelines are **advisory** in nature.  Sentencing is in the Court's discretion and is not required to be within the guideline range. The defendant agrees that,

Defendant's Initials BDS

pursuant to this agreement, the Court may use facts it finds by a preponderance of the evidence to reach an advisory guideline range, and the defendant explicitly waives any right to have those facts found by a jury beyond a reasonable doubt.

## VI.    AGREEMENT NOT BINDING ON COURT

The defendant fully and completely understands and agrees that it is the Court's duty to impose sentence upon the defendant and that any sentence recommended by the Government is **NOT BINDING UPON THE COURT,** and that the Court is not required to accept the Government's recommendation. Further, the defendant understands that if the Court does not accept the Government's recommendation, the defendant does not have the right to withdraw the guilty plea.

## VII.    VOIDING OF AGREEMENT

The defendant understands that if the defendant (a) violates any federal, state, or local law or any condition of pretrial release after entering into this plea agreement, (b) moves the Court to accept a plea of guilty in accordance with, or pursuant to, the provisions of *North Carolina v. Alford*, 400 U.S. 25 (1970), (c) tenders a plea of *nolo contendere* to the charges, (d) violates any other term of this plea agreement, and/or (e) does or says anything that is inconsistent with the acceptance of responsibility, the plea agreement will become NULL and VOID at the election of the United States, and the United States will not be bound by any of the terms, conditions, or recommendations, express or implied, which are contained

Defendant's Initials BOS

herein. Further, such election will not entitle the defendant to withdraw a previously entered plea.

The defendant further understands and agrees that if at any time, the government determines that the defendant has 1) falsified, concealed, covered up, or omitted a material fact; 2) made any false, fictitious, or fraudulent statement or representation; or 3) otherwise provided material information or evidence that is not full, complete, and accurate, the obligations of the government under the plea agreement will become NULL and VOID at the election of the United States, and the United States will not be bound by any of the terms, conditions, or recommendations, express or implied, which are contained herein. In that event, the government may also prosecute the defendant for false statements, perjury, or obstruction of justice and use any admissions made by the defendant at any time, including during plea negotiations, for any purpose. Further, such election will not entitle the defendant to withdraw his previously entered plea.

## VIII.    OTHER DISTRICTS AND JURISDICTIONS

The defendant understands and agrees that this agreement **DOES NOT BIND** any other United States Attorney in any other district, or any other state or local authority.

Defendant's Initials BDS

## IX.    COLLECTION OF FINANCIAL OBLIGATION

To facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees to:

- fully disclose all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party;

- promptly submit a completed financial statement to the United States Attorney's Office, in a form that it provides and as it directs;

- identify all assets over which the defendant exercises or exercised control, directly or indirectly, within the past five years, or in which the defendant has or had during that time any financial interest;

- take all steps as requested by the Government to obtain from any other parties by any lawful means any records of assets owned at any time by the defendant;

- undergo any polygraph examination the Government may choose to administer concerning such assets and to provide and/or consent to the release of the defendant's tax returns for the previous five years.

The defendant further agrees that the above information, as well as any of the defendant's financial statements and disclosures, will be complete, accurate, and truthful. Finally, the defendant expressly authorizes the United States Attorney's

Defendant's Initials BOS

Office to obtain a credit report on the defendant to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

## X.    AGREEMENT REGARDING RELEVANT CONDUCT AND RESTITUTION

As part of the defendant's plea agreement, the defendant admits to the above facts associated with the charges and relevant conduct for any other acts. The defendant understands and agrees that the relevant conduct contained in the factual basis will be used by the Court to determine the defendant's range of punishment under the advisory sentencing guidelines. The defendant admits that all the crimes listed in the factual basis are part of the same acts, scheme, and course of conduct. This agreement is not meant, however, to prohibit the United States Probation Office or the Court from considering any other acts and factors, which may constitute or relate to relevant conduct. Additionally, if this agreement contains any provisions providing for the dismissal of any counts, the defendant agrees to pay any appropriate restitution to each of the separate and proximate victims related to those counts should there be any and waives objection to the inclusion of that restitution in any order issued by the Court.

## XI.    TAX, FORFEITURE AND OTHER CIVIL/ADMINISTRATIVE PROCEEDINGS

Unless otherwise specified herein, the defendant understands and acknowledges that this agreement does not apply to or in any way limit any pending

Defendant's Initials _BDS_

or prospective proceedings related to the defendant's **tax liabilities**, if any, or to any pending or prospective **forfeiture** or other **civil** or **administrative** proceedings.

## XII.    IMMIGRATION STATUS

The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the defendant is pleading guilty. The defendant's guilty plea and conviction make it practically inevitable and a virtual certainty that the defendant will be removed or deported from the United States if the defendant is not a citizen of the United States. Removal and other immigration consequences are the subject of a separate proceeding, however; and the defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. Understanding all of this, the defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences that the plea may entail, even if the consequence is automatic removal from the United States.

## XIII.    DEFENDANT'S ACKNOWLEDGEMENT

I have read and understand the provisions of this plea agreement consisting of twenty four (24) pages. I have discussed the case and my constitutional and other rights with my lawyer. I am satisfied with my lawyer's representation in this case. I

Defendant's Initials BOS

understand that by pleading guilty, I will be waiving and giving up my right to continue to plead not guilty, to a trial by jury, to the assistance of counsel at that trial, to confront, cross-examine, or compel the attendance of witnesses, to present evidence on my behalf, to maintain my privilege against self-incrimination, and to the presumption of innocence. I agree to enter my plea as indicated above on the terms and conditions set forth herein.

**NO PROMISES OR REPRESENTATIONS OTHER THAN THOSE IN THE AGREEMENT HAVE BEEN MADE TO ME BY THE PROSECUTOR, OR BY ANYONE ELSE, NOR HAVE ANY THREATS BEEN MADE OR FORCE USED TO INDUCE ME TO PLEAD GUILTY.**

I further state that I have not had any drugs, medication, or alcohol within the past 48 hours except as stated here:

_____ *None* _____

I understand that this plea agreement will take effect and will be binding as to the Parties **only** after all necessary signatures have been affixed hereto.

I have personally and voluntarily placed my initials on every page of this plea agreement and have signed the signature line below to indicate that I have read, understand, and approve all the provisions of this plea agreement, both individually and as a total binding agreement.

1/25/25
DATE

**BENJAMIN DANIEL SHOEMAKER**
Defendant

Defendant's Initials _BDS_

## XIV.    COUNSEL'S ACKNOWLEDGMENT

I have discussed this case with my client in detail and have advised my client of all my client's rights and all possible defenses.  My client has conveyed to me that my client understands this plea agreement and consents to all its terms. I believe the plea and disposition set forth herein are appropriate under the facts of this case and are in accord with my best judgment.  I concur in the entry of the plea agreement on the terms and conditions set forth herein.

*1-25-25*
DATE

DAVID LUKER
Defendant's Counsel

Defendant's Initials BDS

## XV.    GOVERNMENT'S ACKNOWLEDGMENT

I have reviewed this matter and this plea agreement and concur that the plea

and disposition set forth herein are appropriate and are in the interests of justice.

**PRIM F. ESCALONA**
United States Attorney


01/27/25

DATE

*Michael A. Royster*

**MICHAEL A. ROYSTER**
Assistant United States Attorney


**KATHLEEN WOLFE**
Deputy Assistant Attorney General
Civil Rights Division
United States Department of Justice


01/27/25

DATE

*Mark Blumberg by M.A.R.*

**MARK BLUMBERG**
Special Legal Counsel
Civil Rights Division


01/27/25

DATE

*Andrew Cherry by M.A.R.*

**ANDREW CHERRY**
Trial Attorney
Civil Rights Division

Defendant's Initials BDS

*(Revised June 2022)*